JOSEPH D. TRUXTON and PLANNER J. WILLIAMS, defendants below, plaintiffs in error, *vs.* FAIT and SLAGLE COMPANY, a corporation existing under the laws of the State of Maryland, plaintiff below, defendant in error.

*Replevin—Fraudulent Representations—Rescision of Contract— Execution Creditors—Charging Jury.*

1. The principles of law in relation to fraudulent sales and the right of the vendor to rescind the sale, as laid down in the case of *Mears & Son vs. Waples, 3 Houst. 621*, &c., reaffirmed and approved.

2. The right of a defrauded vendor to avoid the sale of goods obtained from him by false and fraudulent representations of the vendee as to his solvency, cannot be defeated or impaired by a levy on the goods fraudulently obtained, while in the possession of the fraudulent purchaser, under execution process issued at the suit of a creditor whose debts were contracted prior to the fraudulent sale, although such creditor may be a *bona fide* creditor and without notice or knowledge of the fraud. Case of *England vs. Forbes, 7 Houst. 306*, overruled, so far as the same relates to the rights of execution creditors whose debts were contracted prior to the alleged fraudulent sale.

3. A statement by a judge in charging the jury, of matters of fact which were uncontroverted and not in dispute nor in issue, where such statement may be material for the proper elucidation or application of the legal principles involved, would not be in conflict with the provisions of *Section 22* of *Article 4* of our lately amended *Constitution*.

4. The maxim of *stare decisis* has generally been strictly applied where titles to real estate have been acquired or commercial usages have been established under decisions of the court, even where such decisions were erroneous. But where a decision contravenes a plain principle of law, or where in such decision the law has been misunderstood or misapplied, and a reversal will not disturb property rights already acquired or make innovations on established commercial usages, it may then become the duty of the judges to reverse an erroneous decision of the same court.

(*January 19, 1899.*)

JOHN R. NICHOLSON, Ch., WM. C. SPRUANCE, J., and EDWARD RIDGELY, Esq., Judge *ad litem*, sitting.

*Charles F. Richards, Charles M. Cullen* and *Charles W. Cullen* for plaintiffs in error.

*Lewis C. Vandegrift, Albert F. Polk* and *Charles M. Curtis* for defendant in error.

Supreme Court, June Term, 1898.

Writ of error to the Superior Court of Sussex County.   See statement of facts in opinion of court.

BRIEF of argument and citations of plaintiffs in error :

The doctrine of *stare decisis* is fully recognized by the courts of this state, and nowhere can be found, in our reports, any limitations of that doctrine.   *Deputy vs. Harris & Co., 1 Hardesty, 92.*

It is a general maxim that when a "point has been settled by a decision it forms a precedent, which is not aftewards to be departed from," unless reversed by a court of last resort.   *1 Bouv. Law Dictionary, 661; Hogatt vs. Bingaman, 7 How. (Miss.), 569; Syder vs. Gascoigne, 11 Texas, 455; 29 Ind., 470; 31 Cal., 402; 22 Cal., 110; 15 Wis., 691; Wells' Res Adjudicata and Stare Decisis, Secs. 587 and 596; Greenbaum vs. Stein, 2 Daly, 226.*

A decision once made by a court cannot be disturbed or reversed by the same court, or by a court having concurrent jurisdiction.   *1 Kent's Com., 13 Ed., 476; State vs. Whitworth, 8 Lea. (Term), 594; Wells' Res Adjudicata and Stare Decisis, Secs. 424 and 613-14-15-16 and 17.   Stacy vs. R. R., 32 Vt., 552; Hoffman vs. State, 30 Ala., 534; Hawley vs. Smith, 45 Ind., 183; Parker vs. Pomeroy, 2 Wis., 122; Ewing vs. Ewing, 24 Ind., 470; Thomason vs. Dill, 34 Ala., 177; Grignon's Lessees vs. Astor, 2 Howard, 343.*

The Superior Court was without authority to overrule the decision made in the case of *England vs. Forbes, 7 Houst. 301,* upon a similar case presented as the case at bar, recognized as it was by the court to be similar from the language used by the court in charging the jury ; the court said :   "When goods are purchased under fraudulent representations as to the solvency of the puchasers and levied upon by execution of a *bona fide* judgment creditor, having no notice or knowledge of any such representation, the execution lien cannot be disturbed, but will hold

good against the defrauded seller. We cannot so charge. We do not think this proposition is sound in principle or supported by well considered authority. In a case like the present, where the debt due the execution creditor, who has levied upon the replevied goods, was contracted prior to the alleged fraudulent sale. It is true that in *England vs. Forbes, 7 Houst. 306*, it was so decided."

*Butler & Anne Ux vs. Duncomb, 1 P. Williams, 452; Chamberlain's Stare Decisis, 5 to 31; Alexander vs. Worthington, 5 Ind., 488-9; N. Y. R. R. Co. vs. Ketchum, 3 Keyes, 363; Wright vs. Wakeford, 4 Taunton, 213.*

A solemn decision upon a point of law, arising in any given case, becomes an authority in a like case, because it is the highest evidence which we can have of the law applicable to the subject, and the judges are bound to follow that decision so long as it stands unreversed, unless it can be shown that the law was mis-understood or misapplied in that particular case. If a decision has been made upon solemn argument and mature deliberation, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it.

*1 Kent's Com. (13th Ed.), 476-8; Bates vs. Relyea & Wright, 23 Wend., 340.*

If the ninety-six thousand tin cans in dispute in this case were purchased under fraudulent representations, as to the solvency of the purchasers, and afterwards levied upon by execution of a *bona fide* judgment creditor, having no notice or knowledge of any such representation, the execution lien cannot be disturbed, but will hold good against the defrauded seller.

*Benjamin on Sales, par. 433; Donaldson vs. Farwell, 93 U. S., 631; England vs. Forbes et al., 7 Houst., 301; Noble vs. Adams, 7 Taunton, 621; Mears & Son vs. Waples, 3 Houst., 79; Hoffman vs. Noble, 6 Met., 68, etc.*

A *bona fide* judgment creditor, one who in good faith advances money, or, in the ordinary course of business, incurs liabilities, on the faith of the title of a fraudulent possessor, is a *bona fide* purchaser.

*Hilliard on Sales, 333; Caldwell vs. Bartlett, 3 Duer, 341; Wood vs. Yeatman, 15 B. Mon., 270.*

It is the prevailing doctrine, that one who *bona fide* purchases from the first vendee, before the vendor elects to avoid the sale, (or, it seems, an attaching creditor, whose claim accrued after the sale) will hold against the vendor.

*Hillard on Sales, 332; Root vs. French, 13 Wend., 570.*

In this case the contract of sale was made in the month of January, 1895, and two of the executions under which the sheriff levied upon the goods were issued upon judgments, which were obtained for debts created subsequent to the date of the sale, namely on the second day of July, 1895. These judgment creditors were *bona fide* purchasers without notice as declared by *Hilliard on Sales, 332-333,*

BRIEF of argument and citations of defendant in error :

Only those assignments of error will be considered which seem to be necessary or proper in the determination of this case.

SIXTH ASSIGNMENT OF ERROR.—This prayer for instruction was properly refused.

Rescission by a vendor of the contract of sale on account of fraud was not a prerequisite to the bringing of a writ of replevin to recover the goods fraudulently purchased. Suing out the writ of replevin is in itself a rescission of the contract.

*Oswego Starch Co. vs. Lendrum, 57 Iowa, 573, (10 M. W. 900). Hall vs. Gilmore, 40 Me., 580.*

Another consideration in favor of the contention of the defendant in error is the well established principle that surrender by the vendor at the trial of notes given by the vendee for the whole of the price of goods fraudulently purchased, is sufficient, and that surrender or offer to surrender them before suit brought is not necessary.

*Nicholas vs. Michael, 23 N. Y., 264; Naugatuck & Co. vs. Babcock, 22 Hun., 481; Cogill vs. Boring, 15 Cal., 214; Ayers vs. Hewitt, 19 Me., 281; Jordan vs. Parker, 56 Me., 557; Schofield vs. Shiffer, 27 Atl. Rep., 69; Sloan vs. Shiffer, 27 Atl. Rep., 67.*

A demand before bringing an action of replevin is no longer necessary in Delaware.

EIGHTH ASSIGNMENT OF ERROR.—There was no error in the statement by the court here objected to.

Attaching and execution creditors of the vendee are not *bona fide* purchasers for value, unless the debt was incurred subsequently to the fraud, and upon the credit of the goods thus procured.

*Jordan vs. Parker, 56 Me., 557; Poor vs. Woodburn, 25 Vt., 234; Field vs. Sterns, 42 Vt., 106; Bradley vs. Obear, 10 N. H., 477; Oswego Starch Co. vs. Lendrum, 57 Iowa, 573; Naugutuck &c. Co. vs. Babcock, 22 Hun., 481; Atwood vs. Dearborn, 1 Allen, 483; Am. Exp. Co. vs. Willsie, 79 Ill., 92; Gilbert vs. Hudson, 4 Me., 345; Thompson vs. Rose, 16 Conn., 71; Devoe vs. Brandt, 53 N. Y., 462; Farley vs. Lincoln, 51 N. H., 577, 581; Buffington . vs. Gerrish, 15 Mass., 158; Hall vs. Gilmore, 40 Me., 580; Schweizer vs. Tracey, 76 Ill., 345; Williamson vs. N. J. &c. R. R., 29 N. J. Eq., 311; Schofield vs. Schiffer, 27 Atl. Rep., 69 (Pa. 1893); Thaxter vs. Thayer, 26 N. E., 434 (Mass. 1891).*

The rule which denies to an antecedent execution creditor the favor given to *bona fide* purchasers, is supported by other well settled cognate principles of law, viz :

A defrauded vendor may recover possession of his goods from a voluntary assignee for the benefit of creditors, and *a-for-tiorari* from an assignee in bankruptcy.

*Donaldson vs. Farwell, 93 U. S., 631; Farley vs. Lincoln, 51 N. H., 377.*

A pre-existing indebtedness is not such a consideration as makes the transfer from a defrauded vendee valid, and the defrauded vendor may recover the goods from such a creditor.

*Poor vs. Woodburn, 25 Vt., 234; Sargent vs. Sturm, 23 Cal., 360; Hurd vs. Bickford, 27 Atl. Rep., 107 (Maine 1892); Greeve vs. Taylor, 42 N. E., 829 (Ohio 1895); Goodwin vs. Mass. &c. Co., 25 N. E., 100 (Mass. 1890); Phoenix Iron Works vs. McEvency, 66 N. W. Rep., 291 (Neb.); Reed vs. Brown, 56 N. W., 661 (Iowa 1893).*

It has been held that a creditor of a fraudulent vendee who levies on and sells the goods fraudulently purchased, on an execution against the fraudulent vendee, acquires no title if he becomes a purchaser at the execution sale.

*Sargent vs. Sturm, 23 Cal., 359; Devoe vs. Brandt, 53 N. Y., 462.*

NINTH ASSIGNMENT OF ERROR.—It is not a correct statement to say that the court charged the jury that the debts due the execution creditors were contracted prior to the alleged fraudulent sale.

True, on page 134 of the record, the court inadvertently makes such a statement, but on page 141 the court, as was proper, left the decision of this and other questions of fact to be determined by the jury.

Moreover, there was direct evidence that the debts owed to the several execution creditors were contracted before the sale, or at least before the delivery to Morrow and Coulbourn of the goods.

Mr. Morrow, a member of the debtor firm and one of the defendants in the judgment on which the executions were issued, admitted that the execution creditors were creditors of long standing prior to the sale of the goods to Morrow and Coulbourn.

Henry M. Baker, cashier of the First National Bank of Seaford, testified that from October, 1894, his bank gave credit to Morrow and Coulbourn to the amount of three thousand dollars, and that the Sussex National Bank of Seaford gave a similiar line of credit. It appears then from his testimony, corroborating statements of Mr. Morrow, that at and long before the time of the sale by the plaintiff to Morrow and Coulbourn, the two banks, two of the execution creditors, were creditors of Morrow and Coulbourn.

It appears affirmatively from the statements of the judgments on which the executions mentioned in the pleas were issued (which statement was offered in evidence by the plaintiff) that the indebtedness of Morrow and Coulbourn to each of the other execution creditors was created prior to the sale by the

plaintiff to Morrow and Coulbourn, for they all bear interest from a date antecedent to such sale.

It is submitted, therefore, that such a statement by the court as that complained of in this assignment of error, if made, was a correct and uncontradicted statement of fact appearing from the testimony by abundant evidence and that the jury were justified by the conclusion to which under the charge they must necessarily have arrived, viz: That the debts of all the execution creditors were created prior to the alleged sale, and that they could not therefore have relied on possession of the goods as security for their debts, or given the credit to Morrow and Coulbourn on the faith of possession by their debtor of said goods. Indeed, it was not contended otherwise at the trial and the court were justified by admissions of counsel for defendants at the trial in stating the debts were created antecedent to the sale.

If there is any uncertainty as to the proof as to the date of creation of the indebtedness to the several execution creditors, it will operate against these creditors, for the burden of proof is on them.

THIRTEENTH ASSIGNMENT OF ERROR.—The testimony of Mr. Kirwan objected to in this assignment of error, is to the following effect: That Kirwan sold goods to Morrow and Coulbourn at or about the same time that plaintiff sold to them, and that the broker for Morrow and Coulbourn at the time of the purchase from Kirwan represented to Kirwan that Morrow and Coulbourn were perfectly solvent and paid for their goods promptly.

In an action of replevin by a defrauded seller to recover possession of goods purchased on account of fraudulent representations by the vendee as to solvency, evidence of similar representations by the vendee to other persons who sold goods to the same vendee about the same time, is admissible to show that the purchase from the plaintiff was part of a fraudulent scheme.

*Rowley vs. Bigelow, 12 Pick., 307; Carey vs. Hotailing, 1 Hill, 311; Olmstead vs. Hotailing, 1 Hill, 317; Hall vs. Naylor, 18 N. Y., 589; Bradley vs. Obear, 10 N. H., 477; Naugutuck &c. Co. vs. Babcock, 22 Hun., 481; Schofield vs. Shiffer, 27 Atl. Rep., 69, (Pa. 1893).*

A writ of error will not lie to the judgment of a court granting or refusing a non-suit.

*May vs. Curry, 4 Harr., 265.*

The rule of *stare decisis* has no force or application in this case in this court.—Where a plain rule of law has been violated by a court it should be overruled. *1 Kent Com., 477; Paul vs. Davis, 100 Ind., 422; McFarland vs. Pico, 8 Cal., 626.*

"The highest regard for the doctrine of *stare decisis* does not require its observance when a plain rule of law has been violated."

*McFarland vs. Pico, (supra).*

The rule of *stare decisis* is a rule of policy and not of obligation.

It has no application to a case pending in the highest judicial tribunal of a state where there are contrary conflicting decisions of a lower court, which court is, in this particular, a *nisi prius* court. The Supreme Court can now judge between the decisions, and determine which one correctly states the law.

As Elliott J. said in *Paul vs. Davis, 100 Ind., 422:* "There is not a court in England or America that has not corrected erroneous departures from the principles of justice by overthrowing previous decisions."

In our state cases have been overruled.

A judicial decision does not make unalterable law, nor is it law in the sense that statutes are law. The decisions of courts are not the law; they are only the evidences of the law.

*Paul vs Davis, 100 Ind., 422.*

Chancellor Kent well states the matter thus :

"Even a series of decisions are not always conclusive evidence of what is law; and the revision of a decision very often

resolves itself into a mere question of expediency, depending upon consideration of the importance of certainty in the rule and the extent of property to be affected by a change of it.

It is probable the records of many of the courts in this country ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired and the beauty and harmony of the system destroyed by the perpetuity of error.''

*1 Kent Comm., 477.*

'' The law is a science of principles and this cannot be true if a departure from principle can be perpetuated by a persistence in error.''

''Consistency purchased by adherence to decisions at the sacrifice of sound principles is dearly bought.''

A single decision of any court is not absolutely conclusive as a precedent.

*Bronson, Jr., in Butler vs. Van Wyck, 1 Hill, 438-462; Pratt vs. Brown, 3 Wisc., 603-609.*

The rule of *stare decisis* has been rigidly applied where the rule of law under consideration relates to title of real estate. Here, truly enough, it is important to adhere to established rules though they be erroneous, because the change would unsettle titles to land, upon faith in which land has been bought and sold.

Not so, however, where the rule of law relates to rights of creditors as in this case.

EDWARD RIDGELY, ESQ., Judge *Ad Litem*, delivering the opinion of the court :

This was an action of replevin brought by Fait & Slagle Company, a corporation existing under the laws of the State of Maryland, the plaintiff below, to the October Term, 1895, of the Superior Court of the State of Delaware in and for Sussex County, against Joseph D. Truxton and Planner J. Williams, defendants below, plaintiffs in error, for the recovery of ninety-six thousand tin cans, alleged to have been sold by the said Fait

and Slagle Company to James B. Morrow and William J. Coul-
bourn, partners, trading under the firm name of Morrow &
Coulbourn and then doing business as packers of canned goods
in the town of Seaford, Sussex County. At the time the writ of
replevin was issued there had been issued out of the said Superior
Court five several writs of *fieri facias* attachment—one at the
suit of Annie E. Coulbourn *vs.* James B. Morrow and William
H. Coulbourn for the real debt of $2000, with interest from the
twenty-fifth day of August, A. D. 1895, and costs, and issued on
the third day of July, A. D. 1895, being No. 340, to the October
Term of said court; another at the suit of William H. Coulbourn,
Frank W. Coulbourn and Joseph N. Coulbourn, executors of
Michael Coulbourn, deceased, *vs.* James B. Morrow and William
H. Coulbourn, trading as Morrow and Coulbourn, for the real debt
of $1,000, with interest from the third day of June, A. D. 1891,
and costs, issued on the third day of July, A. D. 1895, being No.
342 to October Term, 1895, of said court ; another at the suit of
Frank W. Coulbourn and Joseph N. Coulbourn *vs.* William H.
Coulbourn for the real debt of $5,181.82 with interest from the
twenty-first day of June, A. D. 1895, and costs, issued on the
third day of July, A. D. 1895, and being No. 344 to October
Term, 1895, of said court ; another at the suit of the First
National Bank of Seaford *vs.* James B. Morrow and William H.
Coulbourn for the real debt of $4,450, with interest from the
second day July, A. D. 1895, and costs, issued on the third day
of July, A. D. 1895, being No. 346, to October Term, 1895, of
said court ; and the other at the suit of the Sussex National
Bank of Seaford *vs.* James B. Morrow and William H. Coulbourn
for the real debt of $3,000, with interest from the second day of
July, A. D. 1895, and costs, issued on the fifth day of July, A.
D. 1895, and being No. 350, to October Term, 1895, of said
court : That each of said writs was on the day it was issued
duly delivered to Joseph D. Truxton then being Sheriff of Sussex
County to be executed, and that the said Joseph D. Truxton,
then Sheriff as aforesaid, under and by virtue of said writs of
execution seized and levied upon the goods and chattels of the
said Morrow and Coulbourn and, among other goods and chattels,

seized and levied upon the ninety-six thousand tin cans in controversy in this suit, and that the said Planner J. Williams was deputed by the said Joseph D. Truxton, then Sheriff as aforesaid, to guard and watch over the property levied upon under said executions. At the time the said writ of replevin was issued at the suit of Fait & Slagle Company, the said ninety-six thousand tin cans had been seized and levied upon by the said Joseph D. Truxton, then Sheriff as aforesaid, as the property of the said Morrow and Coulbourn under and by virtue of the above mentioned writs of *fieri facias* attachment and when the said writ of replevin was served upon the said Joseph D. Truxton, then Sheriff as aforesaid, he gave counter bond, or, as it is sometimes called, a property bond, and retained the said ninety-six thousand tin cans, and afterwards sold the said tin cans together with the other property levied upon and applied the proceeds of said sale to the executions in his hands according to their priority.

At the trial in the court below it was alleged by the plaintiff below that in January, 1895, the said Morrow and Coulbourn contracted with the plaintiff below for the purchase of ninety-six thousand tin cans, and that said cans in pursuance of said contract were delivered to the said Morrow & Coulbourn at Seaford, their place of business, in three lots, on the 25th, 27th and 29th days of June, 1895, and it was then contended by the plaintiff below that the said plaintiff was induced to make the sale and delivery of the said tin cans to the said Morrow & Coulbourn by reason of the false and fraudulent representations of the said Morrow and Coulbourn, or their accredited agent, as to their solvency, and therefore that the said plaintiff was entitled to have the cans delivered to them by the Sheriff, on demand, under the writ of replevin. On the other hand, the defendants below at the trial denied that any false or fraudulent representations of solvency were made by the said Morrow & Coulbourn, or any accredited agent for them to the said plaintiff below, and that even if such false and fraudulent representations were made, the plaintiff below did not make sale of said tin cans on the faith of such representations, but relied on other sources of information,

and further that, admitting that said Morrow & Coulbourn obtained the said tin cans by false and fraudulent representations as to their solvency, yet, as the plaintiffs in the above stated executions were *bona fide* creditors of the said Morrow and Coulbourn without notice or knowledge of such false and fraudulent representations, their levies under the above mentioned executions would hold good against the seller who had parted with his goods by means of such false and fraudulent representations. There were other contentions made by the defendants below at the trial which it is not necessary to notice here, as they were abandoned at the hearing of the cause in this court. The charge to the jury will be found in full in the case of *Fait & Slagle Co.*, *vs. Truxton, et al.*, *1 Pennewill's Delaware Reports, 41.*

The assignments of errors in this court by the plaintiffs in error were sixteen in number, but at the hearing in this court the counsel for the plaintiffs in error abandoned and withdrew the first, second, sixth, seventh, eighth, tenth and thirteenth, leaving the following exceptions, upon which they relied, viz :

*Third.* That the court erred in not charging the jury that no recovery could be had by plaintiff in this action, inasmuch as no proof was introduced to show that the execution creditors of Morrow and Coulbourn were cognizant of a fraud practiced by said firm upon the plaintiff, and consequently said execution creditors occupied the same position as purchasers for value without notice, as requested by defendant's counsel.

*Fourth.* That the court erred in not charging the jury, as requested by counsel, that goods obtained by fraudulent representations may be reclaimed by the seller from the purchaser, if he seasonably rescind the sale, yet if purchaser sells them for a valuable consideration to a third person who has no notice of the fraud, or consigns them to such person for sale, and he advances money thereon before the first seller interposes, such purchaser or consignee will hold the goods against the first seller.

*Fifth.* That said court erred in not charging the jury, as requested by defendant's counsel, that where goods purchased

under fraudulent representations, as to solvency of the purchasers, are levied upon by execution of a *bona fide* judgment creditor, having no notice or knowledge of any such representation, the execution lien cannot be disturbed, but will hold good against the defrauded seller.

*Ninth.* That the court erred in charging the jury that the debts due the execution creditors, who levied upon the replevied goods were contracted prior to the alleged fraudulent sale.

*Eleventh.* That the court erred in charging the jury that, "We therefore instruct you that if you believe these cans were purchased by Morrow & Coulbourn from Fait & Slagle, by fraudulent representations, and while in the hands of Morrow & Coulbourn, were levied upon under executions issued on the judgments of other creditors, whose debts were antecedently contracted as aforesaid, such liens will not hold good against the defrauded seller, who has elected to avoid the sale, or prevent him from recovering these goods or the value thereof in this action."

*Twelfth.* That the court erred in not charging the jury, as requested by the defendants' counsel, that "When goods are purchased under fraudulent representations as to the solvency of the purchasers, and levied, by executions of *bona fide* judgment creditor having no notice or knowledge of any such representations, the execution lien cannot be disturbed, but will hold good against the defrauded seller."

*Fourteenth.* For that the said court erred in reversing the case of *England vs. Forbes, et al., 7 Houst., 310*, the questions of law involved in said case being precisely similar as those in this case, inasmuch as said case of *England vs. Forbes, et al.*, was the unanimous decision of the Superior Court made after due deliberation, whereas the said case was overruled by a mere majority of the judges composing said court, one judge dissenting.

*Fifteenth.* That the said court erred in not granting a non suit as asked in this case, inasmuch as the principles involved in

this case were *res adjudicata* in the decision of *England vs. Forbes, et al.*

*Sixteenth.* That the said court erred in not granting a non suit, and adhering to the decision in case of *England vs. Forbes, et al* , since we now have two opposite decisions on the same subject matter, thus violating the principle of *stare decisis.*

As some of the above quoted assignments of errors, and especially the third, fourth, fifteenth and sixteenth assignments were not pressed and were but very briefly alluded to in the arguments of the counsel for the plaintiffs in error, we do not deem it necessary to consider each of the errors assigned separately, but to consider the principal ones upon which the counsel for the plaintiffs in error relied, as we think a consideration of these will dispose of the other errors assigned. As to the fourth assignment of error, however, we have only to say that it is not sustained by the facts. For the Chief Justice in his charge to the jury while quoting from the case of *Mears & Son vs. Waples, 3 Houst., 620,* says : "A purchaser for a valuable consideration, without knowledge or notice of fraud, takes a valid title from the fraudulent buyer, which cannot be defeated by the original vendor. And a consignee of goods who in good faith makes advances upon them, stands precisely in the same position as a purchaser for value, and the same principles of law in this regard apply to this case ; and permit me to say that this doctrine of the law is most reasonable and just, because the owner having voluntarily parted with his goods and clothed the buyer with a title which is good until the seller avoids it—which he may do or not as he pleases—it is through his own act that the buyer from him is enabled to sell the goods, and, therefore, a *bona fide* purchaser of them, without knowledge of the circumstances, ought not to be made suffer." It will be observed that the fifth, eleventh and twelfth assignments of errors are substantially alike, though differently expressed, and involve the same principles of law. We shall therefore consider these exceptions together, as involving the same legal principles ; and we think that a consideration of these assignments will dispose of the third assignment of error.

In the case of *H. H. Mears & Son vs. Waples, 3 Houst., 620 and 621*, Chief Justice Gilpin in charging the jury, among other things, used this language : ''A contract which has been incepted in fraud, is so vitiated by it that it may be rescinded and avoided, or not, at the option of the injured party. And if it be a contract of sale, the seller may reclaim the goods, provided the rights of a third party as a *bona fide* purchaser of them have not intervened. But the right of the seller to rescind or avoid the contract, and reclaim the goods from the buyer on the ground of fraud, exists only so long as the goods are in the hands of the fraudulent purchaser, or of some one who has taken them of such fraudulent purchaser with knowledge of the fraud by which they were originally obtained. I have already said that in case of fraud on the part of the buyer, the seller may avoid the contract before the interests of third parties, in good faith and for value, become involved in the transaction. Until then, it is at the seller's option to avoid, or affirm the contract. But until the contract is rescinded or avoided, the title or property in the goods is in the buyer, and he may sell or dispose of them to a *bona fide* purchaser for value, and thus vest in him a good, indefeasible, and irrevocable title to the property. It, therefore, follows both justly and logically, that a purchaser for a valuable consideration without knowledge or notice of fraud, takes a valid title from the fraudulent buyer, which cannot be defeated by the original vendor. And a consignee of goods who in good faith makes advances upon them, stands precisely in the same position as a purchaser for value, as against the original vendor, and the same principles of law in this regard, apply to this case. And permit me to say that this doctrine of the law is most reasonable and just, because the owner having voluntarily parted with his goods and clothed the buyer with a title which is good until the seller avoids it, which he may do, or not, as he pleases ; it is through his own act that the buyer from him is enabled to re-sell the goods ; and, therefore, a *bona fide* purchaser of them without knowledge of the circumstances ought not to be made suffer. After delivery of the goods in pursuance of a sale, the seller cannot rescind the contract, or reclaim the goods on the

ground of fraud without proving deceptive assertions, or false representations, in some form or other, fraudulently made to induce him to part with his property. Mere insolvency of the buyer, though well known to himself and concealed from the seller, does not in itself furnish sufficient grounds for rescinding a contract of sale. Nor will the fraudulent purchasing and obtaining of goods with an intention of never paying for them of itself render the contract of sale absolutely void, even as between the seller and buyer; yet, it will render it voidable at the election of the seller, but if the goods are sold by such fraudulent buyer to an innocent third party for value, the latter will take and hold them by a valid title. And, therefore, it may be laid down as settled law, that although as between the original parties, a sale and delivery of goods obtained by fraud is voidable, and may be rescinded at the option of the seller, and the goods reclaimed from the fraudulent purchaser, yet, as heretofore intimated, if the goods have passed into the hands of a *bona fide* purchaser for value, without knowledge or notice of the fraud, such purchaser will take a title which cannot be revoked or impeached by the defrauded seller.'' We quote largely, as we think the principles enunciated by Chief Justice Gilpin are material to the proper consideration of the case before us.

The case of *Mears & Son vs. Waples*, was taken up to the Court of Errors and Appeals on a writ of error and exceptions to the charge, *4 Houst.*, *62*, where all the exceptions were overruled and the judgment below affirmed; we do not think, however, that there were any exceptions taken to that part of the charge of the court which we have just quoted, and we now re-affirm and approve the principles of law in relation to fraudulent sales and the right of the vendor to rescind the sale, as laid down by Chief Justice Gilpin in the extracts above quoted.

It was contended by the counsel of the plaintiffs in error that where goods have been purchased by means of fraudulent representations as to the solvency of the purchasers, and levied upon by execution of a *bona fide* judgment creditor having no notice or knowledge of any such representations, the execution lien cannot be disturbed, but will hold good against the defrauded

seller or, in other words, that a *bona fide* execution creditor, having a levy on goods fraudulently purchased, stands in the same position as a *bona fide* purchaser of goods from the party who has obtained them by fraudulent representations. In support of this contention the case of *England vs. Forbes, et al.*, 7 *Houst.*, *301*, was relied upon. In that case Chief Justice Comegys who charged the jury, said among other things : " If in the case of such vitiated contract of sale, the goods sold have been delivered to the buyer, who sells them to another who buys them *bona fide*, without any notice or knowledge on his part of the fraudulent feature of the sale, such innocent purchaser acquires a valid title to them, which cannot be defeated by the original seller. *Likewise, where, after possession has been obtained by a party who purchases under a fraudulent misrepresentation as to his solvency, they be levied upon by an execution issued at the suit of a bona fide judgment creditor, having no notice or knowledge of any such representation, his execution lien cannot be disturbed by, but will hold good against, the defrauded seller.*" It will thus be seen that the court in the case of *England vs. Forbes, et al.*, places a *bona fide* execution creditor, having a levy upon goods which were obtained by fraudulent representations, in the same position as a *bona fide* purchaser of goods from one who has obtained them by fraudulent representations ; and in that case, if the facts are reported correctly, the execution was issued antecedently to the fraudulent purchase of the goods. The same contention was made by the defendants below, plaintiffs in error, at the trial and the same case, *England vs. Forbes, et al.*, was cited and relied upon. In answer to this contention, Chief Justice Lore in his charge to the jury, uses this language : " We are asked by the defendants to charge you that, where goods are purchased under fraudulent representations as to the solvency of the purchaser, and levied upon by execution of a *bona fide* judgment creditor having no notice or knowledge of any such representations the execution lien cannot be disturbed, but will hold good against the defrauded seller. We cannot so charge. We do not think this proposition is sound in principle or supported by well considered authority ; in a case like the present, where

the debts due the execution creditor, who has levied upon the replevined goods, were contracted prior to the alleged fraudulent sale.

" It is true that in *England vs. Forbes*, *7 Houst.*, *306*, it was so decided. It is there however coupled with and placed on the same ground as that of the *bona fide* purchaser for value. Neither the reason nor the authority for such ruling is given. The case seems to stand alone, and is in conflict with an unbroken line of authorities from the leading case of Lickborrow *vs.* Mason down to the present time. The case is not very clearly reported as to the facts and questions involved ; but if it is correctly reported, we think that the ruling therein is very questionable, and the majority of this court hold that it should be disregarded." To this part of the charge the assignments of errors which we are now considering especially relate ; and it devolves upon us to decide whether the court erred in overruling so much of the decision in *England vs. Forbes* as held that a levy upon goods, which have been purchased by means of fraudulent representations, by a *bona fide* execution creditor, of the fraudulent purchaser without notice or knowledge of such fraud could not be. disturbed by, but would hold good against the defrauded seller. It must be observed that the court in that case said nothing as to the fact whether the debts for which the execution was issued were contracted prior or subsequent to the fraudulent purchase, but from the report of the case, it is clear that the debts for which the execution was issued, were contracted prior to the fraudulent purchase ; and we must consider the charge of the court as applicable to the facts proved in that case, and therefore that the decision applied to executions issued for the collection of debts, which were contracted prior to the fraudulent purchase.

The case of *England vs. Forbes* stands alone and unsupported by authority ; at least no decision of any court supporting this decision was cited by the counsel of the plaintiffs in error, and we have been unable to find any decision which would support the ruling in that case. On the contrary, there is an unbroken line of authorities in other states directly in conflict with this decision, some of which, out of the many which might be cited,

we will here cite: *Jordan vs. Parker, 56 Me., 557; Poor vs. Woodburn, 25 Vt., 234; Field vs. Sterns, 42 Vt., 234; Bradley vs. Obear, 10 N. H., 477; Oswego Starch Co. vs. Lendrum, 57 Iowa, 573; Naugutuck &c. Co. vs. Babcock, 22 Hun., 481; Atwood vs. Dearborn, 1 Allen, 483; Am. Exp. Co. vs. Willsie, 79 Ill., 92; Devoe vs. Brandt, 53 N. Y., 462; Buffington vs. Gerrish, 15 Mass., 149; Schweizer vs. Tracy, 76 Ill., 345; Williamson vs. N. J. &c. R. R., 29 N. J. Eq., 311.*

Is the ruling in the case of *England vs. Forbes* reasonable or founded upon any sound legal principles? The Chief Justice in that case likens the execution creditor to a *bona fide* purchaser for value; but as we think, without reason. As was said by the court in the case of *Oswego Starch Company vs. Lendrum, above cited, page 579,* "as an attaching creditor parts with no consideration, and does not change his position as to his claim, to his prejudice, he stands in the shoes of the vendee. It cannot be questioned that the right of rescission as between the vendor and vendee inheres in the contract and attaches to the property. The innocent purchaser for value occupies a different position, and his rights are, therefore, different."

In the case of *Schweizer vs. Tracy, above cited, page 351,* the court says: "The claim of an attaching creditor to protection is not of equal strength with that of a *bona fide* purchaser for a valuable consideration. He parts with nothing in exchange for the property, nor does he take it in satisfaction of any precedent debt. The property is merely seized for the purpose of having it afterward so appropriated. The attaching creditor, by means of his attachment, obtains but a lien. It is a well settled rule, certainly of equity, that the general assignees of a bankrupt take his estate subject to every equitable claim which exists against it by third persons; and so it is with judgment creditors, as respects the lien of their judgments."

We think the ruling in the case of *England vs. Forbes*, on the rights of execution creditors, having levies on goods obtained by means of fraudulent representations, is unsupported by authority and not founded on any sound legal principles. We

believe that the law as laid down in that case would open the door to the perpetration of the grossest frauds. Any insolvent person, who might desire to pay the debts owing by him to his favored creditors, might, by the grossest fraudulent representations, as to solvency, procure a stock of goods or other personal property, and immediately when delivered to him, concealing his fraud, confess judgment in favor of those creditors whom he might prefer, so that such creditors could at once levy upon the property so fraudulently purchased by him, and thus enable them to have their debts paid out of the property so fraudulently purchased, leaving the innocent defrauded seller without any remedy. Besides, it generally happens, that it is only after executions have been issued and levies made thereunder, that a vendor, who has sold his goods by means of false and fraudulent representations as to the solvency of the purchaser, discovers the fraud which has been practiced upon him.

For these reasons, together with the reasons assigned by the Chief Justice in his charge, which we deem it unnecessary to repeat, we are of opinion, that in the case of *England vs. Forbes*, where the execution was for debts contracted before the alleged fraudulent sale, the court erred in ruling, that after possession of goods has been obtained by a party who purchased under a fraudulent representation, as to his solvency, they be levied upon, by an execution issued at the suit of a *bona fide* judgment creditor, having no notice or knowledge of any such representation, his execution lien cannot be disturbed by, but will hold good against the defrauded.

We now hold, that the right of a defrauded vendor to avoid the sale of goods, obtained from him by false and fraudulent representations of the vendee as to his solvency, cannot be defeated, or impaired by a levy on the goods fraudulently obtained, while in the possession of the fraudulent purchaser, under execution process issued at the suit of a creditor whose debts were contracted prior to the fraudulent sale, although such creditor may be a *bona fide* creditor and without notice or knowledge of the fraud.

We now proceed to the consideration of the ninth assignment of errors, which was pressed with earnestness upon the court.    This exception is as follows :    '' That the court erred in charging the jury that the debts due the execution creditors, who levied upon the replevined goods were contracted prior to the alleged fraudulent sale.''

The Chief Justice, in delivering the charge to the jury, at the trial in the court below, starts by stating the contentions of the plaintiff below, and, among other contentions of the plaintiff below, he states the following as one of them :    '' That within a few days after the delivery of the cans at Seaford, they were levied upon by the defendant, Truxton, as sheriff, under sundry executions issued upon judgments in favor of other creditors of said Morrow & Coulbourn, which other debts were contracted prior to the sale and delivery of the cans.''    Further on in his charge when alluding to the contention of the defendants below that '' where goods are purchased under fraudulent representations as to the solvency of the purchasers, and levied upon by execution of a *bona fide* judgment creditor having no notice or knowledge of any such representation, the execution lien cannot be disturbed, but will hold good against the defrauded seller,'' the Chief Justice says, ''We cannot so charge.    We do not think this proposition is sound in principle or supported by well considered authority ; *in a case like the present where the debts due the execution creditor, who has levied upon the replevined goods, were contracted prior to the alleged fraudulent sale*.''    Subsequently the Chief Justice adds :    ''We therefore instruct you that if you believe these cans were procured by Morrow and Coulbourn from Fait & Slagle, by fraudulent representations, and while in the hands of Morrow & Coulbourn were levied upon, under executions issued on the judgments of other creditors, *whose debts were antecedently contracted as aforesaid*, such levies will not hold good against the defrauded seller who has elected to avoid the sale or prevent him from recovering these goods or the value thereof in this action.''    These, we believe, are the only expressions in the charge where allusion is made to the fact, that the debts for which the executions were issued, and levies made, were

contracted antecedently to the alleged fraudulent purchase ; and when first used by the Chief Justice, he was only stating the contentions of the plaintiff below, and when last used as above stated, he submits it to the jury as a fact for their consideration and determination. The charge must of course be considered by us as a whole. It is true that in one part of the charge quoted above, the Chief Justice does assume it to be a fact that the debts for which the executions were issued were contracted prior to the alleged fraudulent purchase, for he says, '' in a case like the present, where the debts due the execution creditor who has levied upon the replevined goods were contracted prior to the alleged fraudulent sale.'' Subsequently, however, he leaves this as a matter of fact for the consideration of the jury and adds : '' It is for you to apply the law as stated by the court to the facts in this case. Of these facts you are the sole judges, and you are to determine them not from any statement in this charge, but from what you heard from the witnesses who testified in the case.''

Section 22 of Article IV. of our recently amended Constitution declares, '' Judges shall not charge juries with respect to matters of fact, but may state the questions of fact in issue and declare the law.'' The counsel for the plaintiffs in error contended that the expressions of the Chief Justice, in his charge, in relation to the time when the debts for which the executions were issued were contracted, were obnoxious to the provisions of the Constitution above quoted and were misleading to the jury.

We have carefully read over and considered the whole testimony which was introduced in this case before the court and jury in the trial below. Mr. Fait, a witness for the plaintiff below, in the course of his testimony stated substantially, that Mr. Coulbourn, a member of the firm of Morrow & Coulbourn, told him that these creditors whom he had preferred were of long standing, some as far back as 1891, and prior to the contract for the sale of the tin cans. Mr. Kirwan, another witness for the plaintiff below, testified substantially in the course of his testimony that some of them (judgment creditors) had been standing some three or four or five years possibly ; certainly three or four. The same

witness further on in his testimony stated that they, meaning Morrow & Coulbourn, admitted to him that the judgments they confessed were of long standing, several years prior, three or four years ; possibly five years.    Henry M. Baker, cashier of the First National Bank of Seaford, a witness for the defendants below, who seems to have been called for the purpose of proving the solvency of Morrow & Coulbourn, among other things testified substantially that from October, 1894, his bank gave a line of discounts to Morrow & Coulbourn to an amount ranging from $3,000 to $3,500 and in the summer to about $5,000, but in the summer of 1895 the loans did not amount to $5,000.    And that the Sussex National Bank of Seaford gave credit to the said Morrow & Coulbourn to the amount of $3,000, that his bank made advances to Morrow & Coulbourn, in June, 1895, to the amount of $450 or $950, he did not recollect which.    If Morrow & Coulbourn "reduced their notes, which I think they did, to $3,000 at the end of 1894, we let them have $950, but I am not clear whether they reduced their notes to $3,000 or $3,500.    If it was $3,500 we only let them have $450."    When questioned as to what time in June these last advances were made he stated that it was in the early part of June, 1895.    The witnesses above named are the only witnesses who gave any testimony as to the time when the debts for which the executions were issued were contracted.    It will be remembered that the tin cans in question were delivered to Morrow & Coulbourn, at Seaford, in three lots, on the 25th, 27th and 29th days of June, 1895. It is certain that three of the five writs of *fieri facias* attachment, viz :    Nos. 340, 342 and 344 to the October term, 1895, were for debts contracted prior to the delivery of the tin cans as the real debt for which these executions were issued bears interest from dates prior to the delivery of the tin cans.    The aggregate amount of the real debt, of these executions, exclusive of interest and costs, is the sum of $8,181.82, which is very largely in excess of the value of the tin cans, their value being estimated at about $1,777, without interest, and, including interest to the day when the charge of the Chief Justice was delivered, would be $2,016.    The fourth writ of *fieri facias* attachment being No. 346, to October

Term, 1895, and issued at the suit of the First National Bank of Seaford, was for the real debt of $4,450, interest from the second day of July, 1895. And the last or fifth writ of *fieri facias* attachment being No. 350, to October Term, 1895, and issued at the suit of the Sussex National Bank of Seaford, was for the real debt of $3,000, interest from the second day of July, 1895.

All of these writs of execution were issued upon judgments confessed under warrants of attorney for the confession of judgments annexed to the bonds; and from the testimony in the case, especially that of Mr. Baker, and which is undisputed, the debts for which these bonds with warrants of attorney annexed, were given to the First National Bank of Seaford and the Sussex National Bank of Seaford, must have been for debts contracted prior to the twenty-fifth day of June, 1895. At the trial of the case no claim was made by the counsel for the defendants below that any of the debts for which the executions were issued were contracted subsequent to the delivery of the tin cans. In not one of the several prayers of the counsel for the defendants below, eight in number, is there a claim, or suggestion, or even intimation, that the debts for which the executions were issued were contracted subsequent to the delivery of the tin cans. From the whole record of the trial, it is apparent that the fact that the debts for which these executions were issued were contracted prior to the delivery of the tin cans, was not disputed or in issue. Certainly it was in the power of the defendants below to have proved that these debts were contracted subsequent to the delivery of the tin cans, had such been the fact, as all the plaintiffs in the executions must have known when their debts were contracted and were directly interested in the result of the trial, the Sheriff being indemnified by them ; and if they had relied upon the fact that their debts were contracted subsequent to the delivery of the tin cans the *onus probandi* would have been on them to prove such fact. All the proof, however, submitted at the trial on this point was to the effect that the debts for which the executions were issued were contracted prior to the delivery of the tin cans, and there was no proof whatever to the contrary.

Judge Grubb, who sat at the trial and who dissented from the majority of the court in overruling the case of *England vs. Forbes*, in the course of his opinion delivered on the motion for non suit, and while commenting on the case of *England vs. Forbes*, (*1 Pennewill's Del. Rep., 34*) said : "That case shows that it was not one where an execution creditor had given credit after the alleged fraudulent sale, but was a case like that now before us of a debt contracted and of a credit given before the time of the alleged fraudulent sale." It certainly appears from this remark of Judge Grubb that he considered it an undisputed fact, and a fact not in issue at the trial, that the debts for which the executions were issued were contracted, and the credit given, before the alleged fraudulent sale.

We therefore conclude from the whole record and proceedings in the trial, that the fact that the executions issued were for debts contracted prior to the alleged fraudulent sale and delivery of the tin cans, was not in dispute or in issue. Therefore we are of the opinion that upon consideration of the whole charge the jury could not have been misled nor the defendants below prejudiced by the statements made by the Chief Justice in his charge in regard to this matter. And we think that a statement by a judge, in charging the jury, of matters of fact which are uncontroverted and not in dispute nor in issue, where such statement may be material for the proper elucidation or application of the legal principles involved, would not be in conflict with the provisions of Section 22 of Article IV. of our lately amended Constitution.

We now pass on to the consideration of the fourteenth assignment of errors ; that the court erred in reversing the case of *England vs. Forbes et al., 7 Houst., 301*, which was pressed with earnestness upon the court. This involves a consideration of the well known maxim of *stare decisis*. Chancellor Kent in his Commentaries, Vol. 1, page 476, while treating of the maxim of *stare decisis* says : "A solemn decision upon a point of law, arising in any given case, becomes an authority in a like case, because it is the highest evidence which we can have of the law applicable to the subject, and the judges are bound to follow that

decision so long as it stands unreversed, unless it can be shown that the law was misunderstood or misapplied in that particular case. If a decision has been made upon solemn argument and mature deliberation, the presumption is in favor of its correctness; and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it. It would, therefore, be extremely inconvenient to the public, if precedents were not duly regarded and pretty implicitly followed. It is by the notoriety and stability of such rules, that professional men can give safe advice to those who consult them; and people in general can venture with confidence to buy and to trust, and to deal with each other. If judicial decisions were to be lightly disregarded, we should disturb and unsettle the great land-marks of property. When a rule has been once deliberately adopted and declared, it ought not to be disturbed, unless by a court of appeal or review, and never by the same court, except for very cogent reasons, and upon a clear manifestation of error; and if the practice were otherwise, it would be leaving us in a state of perplexing uncertainty as to the law." * * * * * * *

* * * * * * * * * * * *

" But I wish not to be understood to press too strongly the doctrine of *stare decisis*, when I recollect that there are one thousand cases to be pointed out in the English and American books of reports, which have been overruled, doubted or limited in their application. It is probable that the records of many of the courts in this country are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired and the beauty and harmony of the system destroyed by the perpetuity of error. Even a series of decisions are not always conclusive evidence of what is law; and the revision of a decision very often resolves itself into a mere question of expediency, depending upon the consideration of the importance of certainty in the rule, and the extent of property to be effected by a change of it."

We approve of these remarks of Chancellor Kent and think that they should be born in mind by the judges when called upon to reverse a former decision made by the same court ; and that they should proceed cautiously in such reversals as there is always a resort to the Supreme Court whose duty it is to correct the errors of inferior tribunals. The maxim of *stare decisis* has generally been strictly applied where titles to real estate have been acquired or commercial usages have been established under decisions of the court ; even where such decisions may have been erroneous, for the reason that a reversal of such decisions would disturb property rights already acquired and would work harm and mischief upon those who have honestly invested their means upon the faith of such decisions. But where a decision contravenes a plain principle of law or where, in such decision, the law has been misunderstood or misapplied and a reversal will not disturb property rights already acquired or make innovations on established commercial usages, it may then become the duty of the judges to reverse an erroneous decision of the same court. In the case of *McFarland vs. Pico, 8 Cal. at page 631*, the court says : "We would not disregard a decision of this court, deliberately made, unless satisfied that it was clearly erroneous. But the highest regard for the doctrine of *stare decisis* does not require its observance when a plain rule of law has been violated." In the case of *Paul et al. vs. Davis, 100 Ind. at page 428*, Justice Elliott in delivering the opinion of the court uses this language : "Consistency purchased by adherence to decisions at the sacrifice of sound principle is dearly bought. But we deem it unnecessary to further pursue this discussion, for we know quite well that there is not a court in England or America that has not corrected erroneous departures from the principles of justice by overthrowing previous decisions." And later on the same judge adds : "Much as we respect the principle of *stare decisis* we cannot yield to it when to yield is to overthrow principle and do injustice. Reluctant as we are to depart from former decisions we cannot yield to them, if, in yielding, we perpetuate error and sacrifice principle. We have thought it wisest to overrule outright rather than to evade, as is often done, by an attempt to distinguish where distinction there is none."

We have, above, expressed our views as to the ruling of the court in the case of *England vs. Forbes*, so far as the same relates to the rights of execution creditors whose debts were contracted prior to the alleged fraudulent sale, and we are of the opinion that such ruling was erroneous. In that case the ruling was to the rights of execution creditors and the reversal of such ruling cannot disturb property rights or make innovations in commercial usages. The defendants below parted with no right nor gave up anything of value in relying on the principles of law stated in *England vs. Forbes*. As was remarked by the counsel of the defendant in error, the reversal of *England vs. Forbes* is in the interest of justice, not to this defrauded vendor only, but to all persons who may be so defrauded in the future.

We think, therefore, that there was no error in the court below in reversing the ruling in the case of *England vs. Forbes* in relation to the rights of execution creditors whose debts were contracted prior to the alleged fraudulent sale. If we were to hold otherwise and to reverse the court on this ground and remand the case for a new trial the court, on such new trial, would be bound by our decision to lay down the law as ruled in the case of *England vs. Forbes*, and if upon such ruling, the plaintiff should except and bring the case before the court again, we should be bound to reverse the court for the error in the ruling and for doing what we had virtually ordered them to do. The folly of such a decision is apparent.

As to the fifteenth and sixteenth assignments of errors, that the court erred in not granting a non suit, we need only say that in the case of *Henry May, defendant below, plaintiff in error, vs. Curry & Davis, plaintiffs below, defendants in error*, decided in the Court of Errors and Appeals, of this State, June Term, 1845, *4 Harr., 265*, that court held that a writ of error will not lie to the judgment of a court granting or refusing a non suit. We adhere to that decision.

The judgment of the court is that all the errors assigned be overruled, and that the judgment below be affirmed.